## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| RODRIGO LEDEZMA PERALES, Individually and as Representative of the Estate of EFRAIN LEDEZMA PERALES, deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 22-cv-00061 |
| DEFENDANTS SERGEANT JONATHAN WUNEBURGER, #7802 LIEUTENANT SCOTT FINLAW, #7596 and CAPTAIN KEVIN WALKER, #6700 in their individual capacities, and GALVESTON COUNTY, | ) ) ) ) ) ) | |
| Defendants. | ) ) | Jury Trial Demanded |

## FIRST AMENDED COMPLAINT

NOW COMES Rodrigo Ledezma Perales, Individually and as Representative of the Estate of the deceased, EFRAIN LEDEZMA PERALES, by and through his attorneys, The Law Offices of Kathleen T. Zellner, P.C. and Doss and Rodriguez, P.L.L.C., and for his First Amended Complaint against Defendants SERGEANT JONATHAN WUNEBURGER, LIEUTENANT SCOTT FINLAW, CAPTAIN KEVIN WALKER, and GALVESTON COUNTY, and states as follows:

### INTRODUCTION

1.      Plaintiff brings this action against Defendants seeking redress for the violation of rights secured to Efrain Ledezma Perales ("Efrain"), Deceased, by the

Fourth, Eighth, and/or Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. §1983.

## JURISDICTION AND VENUE

2.     This court has jurisdiction over the claims raised in this complaint under 42 U.S.C. §1983 and 28 U.S.C. §1331.

3.     Venue is proper under 28 U.S.C. §1391(b)(1) because at least one Defendant resides in this judicial district. Venue is also proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

4.     At the time of his death, Efrain was a citizen and resident of the State of Texas.

5.     Plaintiff, Rodrigo Ledezma Perales, is Efrain's biological brother. On December 8, 2021, Plaintiff was appointed to be the administrator of Efrain's estate by order of the County Court of Galveston County.

6.     At all times relevant herein, Defendant Galveston County, through the Galveston County Sheriff's Office, operated the Galveston County Jail, a 686-bed correctional center located in Galveston, Texas.

7.     On information and belief, Defendant Sergeant Jonathan Wuneburger ("Defendant Wuneburger"), is domiciled in the State of Texas and is a resident of League City, situated within Galveston County.

8.    On information and belief, Defendant Lieutenant Scott Finlaw ("Defendant Finlaw") and Defendant Captain Kevin Walker ("Defendant Walker") are domiciled in the State of Texas and reside within Galveston County.

9.    At all times relevant to this Complaint, Defendant Wuneburger was a duly appointed deputy of the Galveston County Sheriff's Office employed as a correctional officer at the Galveston County Jail.

10.    At all times relevant to this Complaint, Defendants Finlaw and Walker were duly appointed deputies of the Galveston County Sheriff's Office.

11.    At all times relevant to this Complaint, Defendants Finlaw and Walker acted as Defendant Wuneburger's supervisors.

12.    At all times relevant to this Complaint, Defendants Wuneburger, Finlaw, and Walker were acting in the course and scope of their employment.

13.    At all times relevant to this Complaint, Defendants Wuneburger, Finlaw, and Walker were acting under color of state law.

14.    Defendants Wuneburger, Finlaw, and Walker are sued in their individual capacity.

FACTUAL BACKGROUND

15.    Efrain was a 48-year-old Hispanic male standing 5'5" tall and weighing 160 pounds. Defendant Wuneburger was a 42-year-old male standing 6'1" tall and weighing 225 pounds.

16.    Efrain had no violent criminal history.

17. On November 28, 2020, at approximately 8:54 a.m., Efrain was arrested by the Galveston Police Department. He was accused of trespassing the property at 1312 39th Street, Galveston, Texas.

18. After arresting Efrain, Galveston County police officers brought him to the Galveston County Jail at 5700 Ave H Galveston, Texas at approximately 2:18 p.m. He was held at the jail on one count of misdemeanor criminal trespass.

19. On November 28, 2020, at approximately 11:27 p.m., correctional staff informed medical staff that Efrain stated that "bears were chasing him in his cell." Correctional staff also reported that Efrain had tried to walk out of the booking cell. Medical staff spoke with Efrain and determined that Efrain did not know where he was at, his date of birth or the date.

20. The medical staff placed Efrain full suicide precaution for his safety. Medical staff removed Efrain's clothes and gave him a suicide blanket. Efrain was placed in a video monitored cell. Medical staff also started detox checks due to hallucinations and possible withdrawals.

21. On the morning of November 29, 2020, medical staff observed Efrain banging his body against the door of his cell. At approximately 7:40 a.m., medical staff placed Efrain in a restraint chair. The chair was discontinued at approximately 11:22 a.m.

22. At approximately 8:48 p.m., medical staff was aware that Efrain had not had anything to eat or drink. Medical staff observed Efrain hitting the wall and door of his cell with his shoulder. Medical staff decided that it needed to assess Efrain.

23. At approximately 8:55 p.m., Deputy Stines and Deputy Chaminski entered Efrain's cell. Efrain, naked and holding a suicide blanket in front of him, briefly cowered in the cell.

24. The deputies tried to explain to Efrain that he needed to sit down so that he could be assessed. Efrain, due to his confused mental state, was unable to understand what they were asking of him.

25. Efrain appeared to the deputies to be "terrified."

26. The decision was made to take Efrain's vital signs later.

27. Deputy Chaminski exited out of the cell. As Deputy Stines tried to exit out of the cell Efrain, still disoriented, tried to walk out of the cell after him.

28. Deputy Stines exited the cell and was in the process of closing the cell door.

29. As Deputy Stines was closing the cell door, Defendant Wuneburger told Deputy Stines to get out of the way.

30. Defendant Wuneburger then moved into the cell and violently pushed Efrain backwards.

31. As a result of Defendant Wuneburger's excessive, needless force, Efrain fell backwards and hit his head on a raised platform bench.

32. Efrain was immediately rendered unconscious, and it was obvious he had suffered a severe, traumatic injury.

33. As Efrain was lying on the floor unconscious, Defendant Wuneburger proudly told medical staff that now they could take Efrain's vitals.

34.     Efrain was not resisting any correctional officers and he posed no threat or danger to them at the time Defendant Wuneburger used excessive, needless force against him.

35.     At the time of the attack, Defendant Wuneburger was aware of Efrain's slight stature and his lack of a violent criminal history.

36.     At the time of the attack, Defendant Wuneburger was aware of Efrain's disoriented mental state because Efrain was in a suicide prevention cell and his mental state was readily apparent to any observer.

37.     Deputy Stines informed the Texas Rangers after the incident that Efrain did not pose a threat to him or any staff members, he appeared scared, and that the force used by Defendant Wuneburger was unnecessary.

38.     Efrain was transported to the University of Texas Medical Branch hospital in Galveston, Texas.

39.     As a direct consequence of Defendant Wuneburger's attack of Efrain, Efrain suffered severe head injuries.

40.     On or about November 30, 2020, Defendant Wuneburger was placed on administrative leave pending a use-of-force investigation.

41.     On or about December 1, 2020, medical personnel determined that Efrain had no brain activity. Efrain was placed on a ventilator and remained in a chronic vegetative and completely incapacitated state for two weeks.

42.     On December 14, 2020, at approximately 11:43 a.m., Efrain was officially pronounced dead. According to the medical examiner, his death was due to

blunt force head trauma. The medical examiner determined the manner of death to be a homicide.

43.    Following an investigation of Efrain's death, on or about June 24, 2021, a grand jury issued a bill of indictment against Defendant Wuneburger for manslaughter. The indictment accuses him of recklessly causing the death Efrain by pushing him with his hands.

CONCEALMENT OF EVENTS

44.    Despite Efrain being the victim of a crime, neither the Galveston County Sheriff nor the Galveston County District Attorney has provided information about the facts and circumstances surrounding Efrain's death to Efrain's family or its attorneys.

45.    Neither the Galveston County Sheriff nor the Galveston County District Attorney has communicated the findings of any investigation concerning what took place to members of Efrain's family or its attorneys.

46.    Neither the Galveston County Sheriff nor the Galveston County District Attorney has disclosed the names of any civilian or correctional-officer witnesses to members of Efrain's family or its attorneys.

47.    Neither the Galveston County Sheriff nor the Galveston County District Attorney has disclosed the results of the medical examiner's autopsy to members of Efrain's family or its attorneys.

48.     Neither the Galveston County Sheriff nor the Galveston County District Attorney has disclosed Defendant Wuneburger's personnel and training records, nor its policies on use-of-force, to Efrain's family or its attorneys.

49.     The Galveston County District Attorney has failed to keep Efrain's family and its attorneys informed as to the status of criminal proceedings against Defendant Wuneburger.

50.     As a result, Plaintiff's attorneys have had to obtain and cobble together incomplete information from other sources to file the instant lawsuit.

51.     The actions of the Galveston County District Attorney and the Galveston County Sheriff have the appearance of preventing the discovery of information relevant to a lawsuit against Defendant Galveston County and other culpable parties related to the violation of Efrain's constitutional rights.

### DEFENDANT WUNEBURGER'S HISTORY OF EXCESSIVE FORCE

52.     Within the Galveston County Sheriff's Office, Defendant Wuneburger had a reputation of being quick to use needless force.

53.     The Galveston County Sheriff's Office, including Defendant Wuneburger's direct supervisors, Defendants Finlaw and Walker, knew that Defendant Wuneburger had difficulty controlling his anger and had a disposition that made him a danger to those under his authority.

54.     Dating back to 2013, Defendant Wuneburger had approximately 33 incidents which required the completion of a use of force report.

55.     In many of the foregoing incidents, Defendant Wuneburger failed to utilize proper de-escalation techniques prior to using force.

56.     In many of the foregoing incidents, Defendant Wuneburger used needless and excessive force.

57.     The allegations below include only a few examples of those instances in which Defendant Wuneburger utilized unreasonable, excessive force, and in which he demonstrated his anger and proclivity for violence.

58.     After each incident, Defendant Wuneburger was not punished by his employer, the Galveston County Sheriff's Department, retrained on use of force or de-escalation techniques, nor reassigned to a position that did not involve the use of force.

### April 19, 2016

59.     On April 19, 2016, while Defendant Wuneburger was acting as a school liaison deputy at La Marque High School, he observed two female students striking each other.

60.     In his use of force report, Defendant Wuneburger described his actions as follows:

> I called out for them to both stop, but the noises the students were making drowned out my voice. Fearing for their personal safety and the safety of the surrounding students who were beginning to move closer to the fight, I wrapped my arms around both of the females and escorted them to the floor in an attempt to stop the physical altercation.

61.     A video of the incident, captured by a high school student, shows that rather than "wrapp[ing]" his arms around the students and "escort[ing]" them to the ground, Defendant Wuneburger, with a running start, leaped into the students and tackled them.

62.     The video does not substantiate Defendant Wuneburger's claim that he told the students to stop before he tackled them.

63.     The amount of force used by Defendant Wuneburger was excessive and unreasonable.

64.     Although Defendant Wuneburger's supervisors determined that lesser force alternatives were available and that Defendant Wuneburger did not follow training and proper tactics, he was not disciplined, and he was not ordered to undergo additional training in use-of-force and de-escalation techniques.

### *February 28, 2018*

65.     On February 28, 2018, while Defendant Wuneburger was acting as a school liaison deputy at Texas City High School, Defendant Wuneburger arrested a student for disorderly conduct after she allegedly said, "F*** you."

66.     The student, a 17-year-old female, never posed any threat to school staff, students, or to Defendant Wuneburger.

67.     Defendant Wuneburger, angered by the manner in which the student addressed him, pinned the student to a door, restrained her wrist, and swept her legs out from under her and slammed her to the ground.

68. Defendant Wuneburger failed to use de-escalation techniques or available, lesser-force alternatives prior to using force.

69. The force used by Defendant Wuneburger against the student was excessive and unreasonable.

70. Although Defendant Wuneburger's supervisors determined that Defendant Wuneburger utilized excessive force, he was not disciplined, and he was not ordered to undergo additional training in use-of-force and de-escalation techniques.

### *May 11, 2018*

71. On May 11, 2018, while Defendant Wuneburger was acting as a school liaison deputy at Levi Fry Intermediate School, Defendant Wuneburger observed a student disobeying the assistant principal.

72. Without being asked to intervene, Defendant Wuneburger forced the student into a chair. As he and the assistant principal questioned the student, Defendant Wuneburger grabbed the student's hands and later physically escorted him to a different office.

73. Defendant Wuneburger's supervisors determined that in using force, Defendant Wuneburger did not follow Sheriff Department guidelines, lesser-force alternatives were available, and he did not follow training or proper tactics.

74. Specifically, Defendant Wuneburger's supervisors determined that Defendant Wuneburger inserted himself into a situation that was administrative in nature and did not require any use of force.

75.     Although Defendant Wuneburger's supervisors determined that Defendant Wuneburger utilized excessive force, he was not disciplined, and he was not ordered to undergo additional training in use-of-force and de-escalation techniques.

### Defendants Finlaw and Walker's Knowledge of Prior Uses of Force

76.     Prior to November 29, 2020, Defendants Finlaw and Walker were aware of the above-alleged uses of force by Defendant Wuneburger.

### April 5, 2020

77.     On April 5, 2020, Defendant Wuneburger responded to a cell where inmates were refusing to follow verbal directives regarding noise.

78.     Defendant Wuneburger, angered by Inmate Tucker responding sarcastically to his directive, ordered Inmate Tucker to exit the cell.

79.     Inmate Tucker never actively resisted Defendant Wuneburger, and he never posed any threat to correctional staff.

80.     Nevertheless, in the course of cuffing Inmate Tucker, Defendant Wuneburger slammed him to the ground.

81.     Defendant Wuneburger failed to use de-escalation techniques or available, lesser-force alternatives prior to using force.

82.     The force used by Defendant Wuneburger against Inmate Tucker was excessive and unreasonable.

83.     Defendants Finlaw and Walker personally reviewed and approved of Defendant Wuneburger's use of force despite knowing it to be excessive and contrary to department policy.

*May 13, 2020*

84.     On May 13, 2020, Defendant Wuneburger approached Inmate Hagood in the sally port.

85.     It was obvious that Inmate Hagood had been injured, as he had abrasions on his shoulder and bruising to his face.

86.     Inmate Hagood also showed signs of mental instability as he was completely nude and was engaged in pressured speech.

87.     Inmate Hagood never actively resisted Defendant Wuneburger, and he never posed any threat to correctional staff.

88.     As Inmate Hagood's restraints were being removed, he turned towards Defendant Wuneburger in a non-threatening manner.

89.     Defendant Wuneburger turned Inmate Hagood, pushed him against the vehicle, then slammed him to the ground by the back of his neck.

90.     Defendant Wuneburger failed to use de-escalation techniques or available, lesser-force alternatives prior to using force.

91.     The force used by Defendant Wuneburger against Inmate Hagood was excessive and unreasonable.

92. Defendants Finlaw and Walker personally reviewed and approved of Defendant Wuneburger's use of force despite knowing it to be excessive and contrary to department policy.

### *June 4, 2020*

93. On June 4, 2020, Defendant Wuneburger responded to notification of a fight between inmates.

94. Defendant Wuneburger ordered Inmate Peoples to go to Medical.

95. Inmate Peoples responded that he did not need to go to Medical.

96. Defendant Wuneburger angrily told Inmate Peoples, "That is not how things [are] done."

97. Inmate Peoples never actively resisted Defendant Wuneburger, and he never posed any threat to correctional staff.

98. Defendant Wuneburger gripped Inmate Peoples and slammed him to the ground.

99. Defendant Wuneburger failed to use de-escalation techniques or available, lesser-force alternatives prior to using force.

100. The force used by Defendant Wuneburger against Inmate Peoples was excessive and unreasonable.

101. Defendants Finlaw and Walker personally reviewed and approved of Defendant Wuneburger's use of force despite knowing it to be excessive and contrary to department policy.

*July 2, 2020*

102. On July 2, 2020, Defendant Wuneburger responded to a cell to take a drinking cup from Inmate Price.

103. Inmate Price refused to hand over the drinking cup.

104. Angered by anything less than complete obedience to his directives, Defendant Wuneburger grabbed Inmate Price and pinned him face-down on his bunk.

105. Defendant Wuneburger failed to use de-escalation techniques or available, lesser force alternatives prior to using force.

106. The force used by Defendant Wuneburger against Inmate Price was excessive and unreasonable.

107. Defendant Wuneburger prepared the required use of force report over a month later.

108. Defendant Wuneburger falsely indicated in his report that he merely sat Inmate Price on his bunk.

109. Defendant Wuneburger falsely indicated in his report that Inmate Price raised his fists as if to strike him.

110. Defendant Wuneburger did not document that he forced Inmate Price face-down on his bunk.

111. Defendant Finlaw reviewed video of the incident and determined that the report was false, no de-escalation techniques were used, and that the use of force was excessive.

112. Defendant Walker also reviewed the incident.

113. Neither Defendant Finlaw nor Defendant Walker disciplined Defendant Wuneburger for lying in his use of force report, nor did they review Defendant Wuneburger's previous documented uses of force to ascertain if he had been truthful in his description of them.

114. Neither Defendant Walker nor Defendant Finlaw disciplined Defendant Wuneburger for his excessive use of force.

115. Neither Defendant Walker nor Defendant Finlaw ordered Defendant Wuneburger to undergo training on use-of-force or de-escalation techniques.

*November 1, 2020*

116. On November 1, 2020, Defendant Wuneburger took Inmate Daravajans to use the phone.

117. Defendant Wuneburger claimed that Inmate Daravajans was being insolent toward him and therefore ordered him back to his cell.

118. Inmate Daravajans never actively resisted Defendant Wuneburger, and he never posed any threat to correctional staff.

119. As Defendant Wuneburger escorted Inmate Daravajans to his cell, he placed both hands on either side of Daravajans head and applied a double mandibular angle pressure point.

120. Defendant Wuneburger failed to use de-escalation techniques or available, lesser force alternatives prior to using force.

121. The force used by Defendant Wuneburger against Inmate Daravajans was excessive and unreasonable.

122.    Defendants Finlaw and Walker were made aware of Defendant Wuneburger's excessive use of force against Inmate Daravaians prior to Defendant Wuneburger's excessive use of force against Efrain.

123.    Neither Defendant Walker nor Defendant Finlaw disciplined Defendant Wuneburger for his excessive use of force.

124.    Neither Defendant Walker nor Defendant Finlaw ordered Defendant Wuneburger to undergo training on use-of-force or de-escalation techniques.

*November 14, 2020*

125.    On November 14, 2020, Defendant Wuneburger was called to assist in taking Inmate Johnson to lockdown.

126.    Inmate Johnson never actively resisted Defendant Wuneburger, and he never posed any threat to correctional staff

127.    In response to Inmate Johnson's refusal to go to lockdown, Defendant Wuneburger struck Inmate Johnson in the cheek and tased him.

128.    Defendant Wuneburger failed to use de-escalation techniques or available, lesser-force alternatives prior to using force.

129.    The force used by Defendant Wuneburger against Inmate Johnson was excessive and unreasonable.

130.    Defendant Finlaw determined that Defendant Wuneburger failed to follow proper training in using force against Inmate Johnson.

131.    Defendant Walker determined that Defendant Wuneburger used excessive force by striking and tasing Inmate Johnson.

132.   Nevertheless, Defendants Finlaw and Walker did not discipline Defendant Wuneburger, nor did they order him to undergo training on use-of-force or de-escalation techniques.

### *Failure to Supervise, Train, and/or Discipline*

133.   Defendants Finlaw and Walker and the authority to order Defendant Wuneburger to undergo additional training in use-of-force and de-escalation techniques.

134.   Defendants Finlaw and Walker had the authority to discipline and/or recommend that Defendant Wuneburger be disciplined for his repeated use of excessive, needless force, up to and including termination.

135.   Despite their authority over Defendant Wuneburger, Defendants Finlaw and Walker never ordered him to undergo additional training, nor did they discipline him and/or recommend that he be disciplined.

### ADDITIONAL *MONELL* ALLEGATIONS

136.   As exemplified by the above allegations, Defendant Galveston County, through the Galveston County Sheriff's Office, had a pervasive, widespread custom and practice of turning a blind eye towards the excessive force used by its correctional officers.

137.   As alleged herein, on at least four prior occasions Defendant Wuneburger's supervisors determined that Defendant Wuneburger used excessive force and failed to utilize proper de-escalation techniques.

138. Despite Defendant Wuneburger's repeated uses of excessive force, he was not once disciplined for using excessive force nor was he ordered to undergo additional training in use-of-force and de-escalation techniques.

139. In other instances, the Sheriff's Office repeatedly rubberstamped Defendant Wuneburger's use of force as appropriate in lieu of conducting a fulsome investigation into his conduct.

140. In the incidents involving Inmate Tucker, Hagood, Peoples, and Daravajans, the Sheriff's Office failed to: collect and preserve readily available video footage of Defendant Wuneburger's use of force; speak to other correctional officers who witnessed the events; and speak to the inmate to obtain their version of events.

141. Even a cursory investigation of these incidents beyond simply relying on Defendant Wuenburger's description of events would have revealed that Defendant Wuneburger serially utilized excessive and unreasonable force during his interactions with inmates.

142. Instead, the Sheriff's Office relied solely on Defendant Wuneburger's description of events in his use-of-force reports, even after it was determined that he had been untruthful in them.

143. On information and belief, the Galveston County Sheriff's Office had not disciplined a single correctional officer for excessive force—in the form of suspension or termination—in the three years prior to Efrain's death.

## Count I
### Fourteenth Amendment
### Excessive Force Against Pretrial Detainee
### Against Defendant Wuneburger
### (42 U.S.C. §1983)

144. Plaintiff restates and realleges by reference all preceding paragraphs as if fully set forth herein.

145. Defendant Wuneburger knowingly, purposefully, and with deliberate indifference to Efrain's constitutional rights, utilized objectively unreasonable force against Efrain.

146. As more fully alleged above, Efrain did not pose a threat to other inmates or any jail personnel, he was not resisting any correctional officer, he was not attempting to flee, and he was not causing a disturbance in the jail. For these reasons, Defendant Wuneburger's use of force was objectively unreasonable.

147. As further alleged herein, Efrain was a vulnerable inmate, unable to protect himself from violence due to his lack of violent criminal history, slight stature, and readily apparent mental condition. For these additional reasons, Defendant Wuneburger's use of force was objectively unreasonable.

148. Defendant Wuneburger's objectively unreasonable use of force violated Efrain's constitutional rights as secured by the Fourteenth Amendment.

149. As a direct result of Defendant Wuneburger's objectively unreasonable use of force and deprivation of Efrain's constitutional rights, Efrain suffered injuries including pain, suffering, and ultimately his death.

150. As a further direct result of Defendant Wuneburger's objectively unreasonable use of force and deprivation of Efrain's constitutional rights, Efrain's next of kin suffered injuries including mental pain and anguish, lost love, companionship, comfort, and society.

## Count II
### Supervisory Liability
### Against Defendants Finlaw and Walker
### (42 U.S.C. §1983)

151. Plaintiff restates and realleges by reference all preceding paragraphs as if fully set forth herein.

152. Prior to November 29, 2020, Defendants Finlaw and Walker knew that Defendant Wuneburger had issues controlling his anger and a propensity to utilize improper and excessive force against those under his authority.

153. Prior to November 29, 2020, Defendants Finlaw and Walker knew that Defendant Wuneburger had on several occasions failed to utilize proper de-escalation techniques before utilizing force against arrestees and detainees.

154. Prior to November 29, 2020, Defendants Finlaw and Walker knew that Defendant Wuneburger had on several occasions utilized excessive, unreasonable force by, among other things, violently taking arrestees and detainees to the ground.

155. As more fully alleged above, Defendants Finlaw and Walker nevertheless failed to discipline Defendant Wuneburger or order him to undergo additional training in use-of-force and de-escalation techniques.

156. Based on the foregoing, Defendants Finlaw and Walker knew that a highly predictable consequence of their failure to discipline and/or train Defendant Wuneburger would be the violation of the constitutional rights of inmates like Efrain.

157. Based on the foregoing, Defendants Finlaw and Walker knew that a highly predictable consequence of their failure to discipline and/or train Defendant Wuneburger would be that an inmate like Efrain would suffer severe injury and/or death.

158. As evidenced by their repeated failures to discipline and/or provide additional training to Defendant Wuneburger in response to his uses of excessive force, Defendants Finlaw and Walker acted with deliberate indifference to the constitutional rights of inmates such as Efrain.

159. As evidenced by the failure to discipline Defendant Wuneburger in those instances where they knew Defendant Wuneburger misleadingly reported the amount of force he used, Defendants Finlaw and Walker acted with deliberate indifference to the constitutional rights of inmates such as Efrain.

160. Defendants Finlaw's and Walker's repeated failures to discipline and/or provide additional training to Defendant Wuneburger cased the violation of Efrain's constitutional rights.

161. As a direct result of Defendants Finlaw's and Walker's deprivation of Efrain's constitutional rights, Efrain suffered injuries including pain, suffering, and ultimately his death.

162. As a further direct result of Defendants Finlaw's and Walker's deprivation of Efrain's constitutional rights, Efrain's next of kin suffered injuries including mental pain and anguish, lost love, companionship, comfort, and society.

### Count III
### *Monell* Against Defendant Galveston County
### (42 U.S.C. §1983)

163. Plaintiff restates and realleges by reference all preceding paragraphs as if fully set forth herein.

164. As more fully alleged above, the Galveston County Sheriff's Office had a widespread custom and practice of failing to train and discipline correctional officers, like Defendant Wuneburger, who utilized excessive force against detainees.

165. As more fully alleged above, the Galveston County Sheriff's Office had a widespread custom and practice of rubberstamping excessive use of force by its correctional officers by purposefully failing to investigate the events surrounding the use of force.

166. At all times relevant herein, Galveston County Sheriff Henry Trochesset was the final policymaker for the Galveston County Sheriff's Office.

167. At all times relevant herein, Sheriff Trochesset knew and/or had constructive knowledge that the correctional officers at the jail, like Defendant Wuneburger, were not disciplined and/or ordered to undergo additional training after utilizing excessive force.

168. At all times relevant herein, Sheriff Trochesset knew and/or had constructive knowledge that in the vast majority of instances, the use of force by

correctional officers was simply rubberstamped as being appropriate and within department guidelines without an adequate investigation being performed.

169.   Galveston County, through the Galveston County Sheriff's Office and Sheriff Trochesset, disregarded a known or obvious consequence of its actions in that by (1) rubberstamping most uses of force, and (2) failing to discipline and/or train those few officers it did identify as using excessive force, its correctional officers would continue to violate the constitutional rights of inmates like Efrain by utilizing excessive force.

170.   The widespread custom and practices described herein were the moving force leading to the violation of Efrain's constitutional rights and, ultimately, his death.

**Count IV**
**Punitive Damages**
**Against Defendant Wuneburger**
**(42 U.S.C. §1983)**

171.   Plaintiff restates and realleges by reference all preceding paragraphs as if fully set forth herein.

172.   Defendant Wuneburger's use of excessive, needless force against Efrain was motivated by evil intent and/or demonstrates a reckless or callous indifference to Efrain's constitutional rights.

173.   Defendant Wuneburger's conduct renders him subject to punitive damages.

## DAMAGES

174. As a direct result of the unconstitutional conduct alleged herein, Efrain suffered pain and suffering, mental anguish, and death.

175. As a direct result of the unconstitutional conduct alleged herein, Efrain's next of kin have suffered mental pain and anguish, lost love, companionship, comfort, and society.

176. Plaintiff, individually and as representative of Efrain's estate, seeks general and special damages in an amount in excess of the minimum monetary jurisdictional limits of this Court.

177. Plaintiff seeks punitive damages pursuant to 42 U.S.C. §1983.

178. Plaintiff seeks an award of attorney fees and costs under 42 U.S.C. §1988(b).

179. Plaintiff seeks costs and pre-judgment and post-judgment interest as allowed by law.

## JURY DEMAND

180. Plaintiff demands trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

<u>PRAYER FOR RELIEF</u>

Wherefore, Plaintiff requests that this Court enter judgment in his favor and against Defendants awarding compensatory damages, punitive damages, attorneys' fees, costs, pre- and post-judgment interest, and such other and further relief this Court deems just and appropriate.

Respectfully submitted,

/s/ Nicholas Curran
Nicholas Curran
State Bar No. 6291493
*Admitted pro hac vice*
Kathleen T. Zellner & Associates, P.C.
4580 Weaver Parkway, Suite 204
Warrenville, Illinois 60555
(Ph) (630) 955-1212
(F) (630) 955-1111
nick@zellnerlawoffices.com

/s/ Matthew D. Doss
Matthew D. Doss
State Bar No. 24069624
Doss & Rodriguez, PLLC
3131 E. 29th Street
Bldg. D – Suite 200
Bryan, Texas 77802
(Ph) (979) 776-1325
(F) (979) 776-1315
matt@dossrodlaw.com

/s/ Philip Rodriguez
Philip Rodriguez
State Bar No. 24079231
Doss & Rodriguez, PLLC
3131 E. 29th Street
Bldg. D – Suite 200
Bryan, Texas 77802
(Ph) (979) 776-1325
(F) (979) 776-1315
philip@dossrodlaw.com

## Certificate of Service

I hereby certify that on November 22, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Texas. The CM/ECF System will serve participants in the case who are registered CM/ECF users.

/s/ Nicholas Curran
Nicholas Curran